WESTERN UNION TELEGRAPH COMPANY *v.* COWARDIN.

Opinion delivered May 18, 1914.

1. APPEAL AND ERROR—INVITED ERROR—INSTRUCTIONS.—Where the appellant requested the court to submit a certain question as an issue to the jury, he can not complain that the verdict of the jury was erroneous on that issue. (Page 163.)

2. TELEGRAPH COMPANIES—DELAY IN DELIVERING MESSAGES—DAMAGES—QUESTION FOR JURY.—In an action for damages caused by the failure of the addressee of a telegram to hold the dead body of a child until the arrival of the sender, *held* it was a question for the jury to determine whether the failure to hold the body was due to the failure of defendant to deliver the message promptly, or the failure of the addressee to understand the message. (Page 164.)

3. TELEGRAPH COMPANIES—DEATH MESSAGE—DELAY—QUESTION FOR JURY. Where a death message was sent as a "day letter" and not as a "regular message," and the sender alleged damages by reason of a delay in the delivery thereof, *held*, it was a question for the jury under the evidence as to whether the appellant was negligent in sending the message as a "day letter" instead of as a "regular message" (Page 168.)

4. TELEGRAPH COMPANIES—DEATH MESSAGE—"DAY LETTER"—QUESTION FOR JURY.—Where there is a conflict in the testimony as to whether defendant was instructed to send a death message as a "day letter" or "regular message," the question should be submitted to the jury. (Page 168.)

5. TELEGRAPH COMPANIES—DELAY—NEGLIGENCE.—Where a telegraph company's transmitting agent knows, or under the circumstances should know, that on account of the receiving office being closed there will be delay in delivering an urgent message which is intended for immediate delivery, it is incumbent on him to so inform the sender; and, if he fails to do so, the company is liable for damages resulting from such neglect. (Page 168.)

6. TELEGRAPH COMPANIES—KIND OF MESSAGE—DAY LETTER—AGENT OF SENDER.—The sender of a death message sent the same to the telegraph office for transmission. *Held*, it was error to instruct the

jury that the bearer of the message, a boy of fourteen years, was not the sender's agent, and that when the boy said the message was to go as a "day letter," that it was the duty of the agent to explain to the boy the difference between a "day letter" and a "regular message." (Page 169.)

Appeal from Sebastian Circuit Court, Fort Smith District; *Daniel Hon,* Judge; reversed.

### STATEMENT BY THE COURT.

In April, 1909, appellee and her husband adopted a baby boy, eleven months old. They named him Paul Cowardin. Paul died in the Orphan's Home at Monticello, Arkansas, July 30, 1909, at 10 A. M. The superintendent of the Home transmitted a message to appellant's operator at Monticello, addressed to appellee, at Bentonville, Arkansas. The message read as follows: "Paul Cowardin died this morning at 10 o'clock. Will be buried at 9. With heart full of sympathy. Signed, J. M. Williams." The message was delivered to appellant's operator at Monticello at about 1 or 1:30 P. M. Appellant's agent transmitted the message to the relay office at Little Rock. All points north of Monticello were relayed to Little Rock. The records of appellant's office at Little Rock showed that the message was received on that day at 2 o'clock and sent to St. Louis at 3:30, that being the proper relay office for messages to Bentonville, Arkansas.

On account of the Bentonville loop wire being broken, appellant routed the Bentonville business to Fort Smith. At that time the peach harvest was on and the business, for that reason, was heavy. At 5 P. M. that day the day letters were four hours and fifteen minutes behind the regular full rate messages, which took precedence over day letters, and for that reason that message was delayed to await its regular turn, the same being a day letter. The message was pasted on a day letter blank. The day letter blank contained on its face the following: "Send the following day letter subject to the terms on the back hereof which are hereby agreed to," and on the back was endorsed: "Day letters may be forwarded as a de-

ferred service and the transmission of such day letters is, in all respects, subordinate to the priority of transmission and delivery of regular day messages.''

The operator at St. Louis began handling the message at 8:31 P. M. At 9:51 the operator sent it to the operator at Fayetteville, who said he would 'phone it to Bentonville. At 10 o'clock P. M., July 30, 1912, the appellee received the message. She answered at 10:30 that night, as follows: ''Mr. Williams, Monticello Baptist Orphanage. Have body embalmed at my expense and hold, if possible, until I come. Signed, Mrs. Paul Cowardin.'' At 8:15 on July 31, Williams received the last message, and in reply, wired the appellee as follows: ''Your telegram came too late. Can't hold child until you arrive.''

The appellee started from Bentonville to Monticello on July 31, and arrived at Monticello August 1. When she reached Monticello, the baby had been buried a day and a half. She went for the purpose of carrying the baby back with her and burying him beside his father, at Hartford. The child died with pellagra and the officials would not permit her to disinter the remains and move them at that time.

The above are substantially the facts upon which appellee predicated her complaint against the appellant, in which she alleged the latter had neglected to promptly transmit and deliver the messages, and that by reason of such negligence she had been damaged in the sum of $1,200.

The appellant set up that the telegrams were both received and sent as day letters, and denied specifically the allegations of negligence, and denied that the prompt transmission and delivery of either of the telegrams would have caused the body to be embalmed and held until her arrival, and denied that the failure to embalm and hold the body was caused by any delay in the transmission of the messages. Denied that any negligence on appellant's part caused appellee any damage.

The cause was sent to the jury upon instructions which will be noticed in the opinion. There was a verdict and judgment in favor of the appellee in the sum of $800, and the cause is here on appeal. Other facts stated in opinion.

*H. C. Mechem,* for appellant.

*Hal L. Norwood* and *Hill, Brizzolara & Fitzhugh,* for appellee.

WOOD, J., (after stating the facts). 1. The court, at the request of appellant, granted prayers for instructions which told the jury that if the earlier receipt of appellee's request to embalm and hold the body would not have prevented the funeral from taking place when it did, and if the failure to embalm and hold the body was the result of Williams's misunderstanding of appellee's wish, expressed in her telegram, the jury should find for the appellant.

Appellant now contends that the evidence shows conclusively that the failure to embalm the body was not by reason of the late receipt of the message, but because Williams, the superintendent of the Orphans' Home, did not understand that it was appellee's desire to take the body back for burial; that if Williams had known her desire in this respect, the body would have been embalmed notwithstanding the delayed telegram. The appellant, having requested the lower court to submit this as a jury question, is not in an attitude to complain that the verdict of the jury was erroneous on this issue. *Berman v. Shelby,* 93 Ark. 472. Moreover, we are of the opinion that it was proper to submit the issue to the jury.

There was testimony tending to show that if the message had been received on the 30th, the day the child died, the body would have been embalmed and held in compliance with the request of the appellee. There was also testimony which warranted the jury in finding that the telegram was received twenty-two hours after the child died; that the child died with pellagra, an infectious disease; that the funeral cortege was ready to move when the message was received; that the superintendent, the

president of the board of control, and those in charge of the funeral arrangements, including the undertaker, thought that it was best to bury the body at that time as quickly as possible; that it was not safe to the other children in the home to have the casket opened up and the body embalmed. The undertaker does state, in a second deposition, that if he had known that it was appellee's desire to have the body embalmed and removed, he would have removed the same to his parlors and embalmed it, even at that belated hour, if the telegram had been addressed to him. But the telegram was not addressed to him, and he could not have obtained possession of the body for embalming purposes without the consent of the authorities having control over the Home.

It was a question for the jury, under the evidence, as to whether the failure to embalm and hold the body was caused by the delay in delivering the message, or by a failure on the part of Williams to comprehend the meaning of appellee's telegram.

2. The court, at the instance of the appellee, submitted to the jury to find whether or not appellant was negligent in the handling of the message from Williams to appellee, and whether or not appellant was negligent in handling the message in reply from appellee to Williams. The appellant complains that these instructions are without evidence to warrant them. The learned counsel for appellant assumes that there was no negligence on the part of appellant in transmitting the message as a day letter instead of a "straight message," and contends that the uncontroverted evidence shows that, being sent as a day letter, there was no negligence in handling the same. But we are of the opinion that it was a question for the jury, under the evidence, as to whether or not the appellant was negligent, in the first place, in sending the message as a day letter instead of a regular message.

The sender of the message testified that he 'phoned the message to appellant's agent at Monticello, and the agent in charge of appellant's telegraph office at Monticello testified that he would have accepted the message

from Williams by 'phone to be sent to appellee. The difference between the cost of the day letter and a straight message was sixteen cents. He never knew a death message sent as a day letter to save sixteen cents. A death message is only considered as a preferred message when on the prescribed form and sent as such. The 12:30 on the message was in his handwriting. He did not know when he put it there. The habit was to put the time of receiving the message on it. A straight message was given precedence over a day letter. The regular agent stated that he first saw the message about 1:30. The clerk who received the message, witness supposed, placed the day letter blank on it. The witness did not see the boy who brought it. Witness did not think that the handwriting on the message was that of Mr. Williams.

Witness Owens testified that he was clerk of the Iron Mountain Railway Company at Monticello, Arkansas, and on July 30, 1912, he received a message, in the absence of appellant's agent, addressed to Mrs. Pearl Cowardin, Bentonville, Arkansas. He wrote the words, "Day letter—23—paid." He received it from some boy from the Baptist Orphans' Home. The boy who brought it paid the tariff for a day letter on the message. Witness asked the boy if he wanted it sent as a straight message or a day letter, and the boy told witness to send it as a day letter; so witness accepted it as a day letter and put it on the file of the operator where he would get it when he came in. Witness did not explain to the boy the difference between a straight message and a day letter, supposing that the boy had instructions from Williams how to send it. Witness asked him how he wanted it sent, and he answered like he knew. Witness did not put the time it was received on it. He pasted the day letter blank on the back of the message. The paper on which the message was written was headed, "Monticello, Baptist Orphans' Home, Monticello, Arkansas, July 30, 1912." The witness was in the habit of receiving messages in the absence of the operator and collecting for them. He knew Mr. Williams's handwriting; thought this was his hand-

writing. He had never seen any of his handwriting except his signature.

It appears that the testimony of Williams tended to show that the message was transmitted over the 'phone to appellant's agent to be sent to the appellee, without directions as to the form it should take in sending. The message, on its face, showed that it was a death message. Witness was shown Williams's signature to the depositions and testified that the signature upon the message was not similar to the signature on the deposition, but that the signature on the message looked like Williams's signature. He did not know whether the body of the telegram was in Williams's handwriting or not, as he had never seen any of his handwriting except his signature. When a message is received on a plain piece of paper, they usually attach it to the form it is to be sent on, and witness did so in this case.

There is an irreconcilable conflict in the evidence as to whether the message was 'phoned by Williams to the operator at Monticello, or whether or not Williams sent the same to appellant's operator at Monticello by a boy. If the message was given over the 'phone it appears then as a straight message; and, on the contrary, if it was delivered through Williams's agent—a boy—then the testimony is to the effect that the boy directed the agent to send it as a day letter. If the agent received it over the 'phone, he assumed to send it as a day letter without first obtaining the authority of the sender, and was therefore negligent in causing an urgent death message to be classified as a day letter, and in thus having the same delayed in transmission and delivery.

The testimony of the witnesses on behalf of appellant, tending to show that the message was received through the boy as the agent of Williams, is more or less conflicting, in itself, and is in direct conflict with the testimony of appellee. It was therefore a question for the jury as to whether or not the appellant was negligent in the transmission and delivery of the message from Williams to the appellee.

Even though the message may have been directed by the sender to be sent as a day letter, we are of the opinion that it was still a question for the jury to determine as to whether the appellant was negligent in its transmission and delivery. It could serve no useful purpose to discuss in detail the facts which warranted the submission of that question to the jury.

It was a question also for the jury as to whether or not appellant was negligent in handling the message from appellee to Williams. The operator at the office where this message was received was requested by the appellee to forward it immediately, and he promised her that he would do so, but he did not explain to her that the office at the place of delivery was not a night office, and that the message, therefore, could not be delivered on account of office hours until the next morning, causing a delay of nine hours and forty-five minutes in the delivery of the message. Had he informed her she would have used the long-distance telephone.

The case is ruled on this point by the case of *Western Union Telegraph Co. v. Harris*, 91 Ark. 602. In that case we held (quoting syllabus): "Where a telegraph company's transmitting agent knows, or, under the circumstances should know, that on account of the receiving office being closed there will be delay in delivering an urgent message which is intended for immediate delivery, it is incumbent on him to so inform the sender; and if he fails to do so, the company is liable for damages resulting from such neglect."

3. The court granted, among others, appellee's fourth prayer for instruction, as follows: "If you find from the evidence that the message from Mr. Williams to Mrs. Cowardin was sent on plain paper to the office of defendant with sufficient money to pay the regular rate, and the agent of defendant, without explaining to the boy bringing the message the difference in service or cost between the day letters and regular messages, asked which form to send it on, and was told by the boy to send it as a day letter, and on that direction so sent it, and if

you find such direction was without the knowledge of Williams, then the defendant can not avail itself of the deferred service due to the form of the message as a defense for not properly transmitting it.''

This prayer was erroneous and the granting of it was necessarily prejudicial to the rights of appellant. It assumes that it was necessary for appellant's agent, before receiving the same to be sent, as a day letter, to explain to the boy bringing the message the difference in service and cost between day letters and regular messages.

If the boy was entrusted by Williams with the mission of taking the message to appellant's operator and of directing him how to send the same, then it was not appellant's duty to give to Williams's agent any explanation as to the difference between day letters and regular messages. There was nothing in the testimony except the boy's age to warrant the conclusion that he was ignorant of the difference. If the boy was Williams's agent he was under Williams's directions, and Williams himself, for aught the evidence shows to the contrary, may have already explained to him the difference in the messages and the particular form under which he desired the message sent.

If, as contended by appellant's counsel, and as the evidence tends to show, Williams entrusted the boy with the duty of sending the message and gave him authority to send it as a day letter instead of a regular message, then there was no duty on appellant to explain to Williams's agent the difference between straight messages and day letters. Williams could select his own method for transmitting the message to appellant's operator, and it was his province to select the form that he wished the message to take. It was not incumbent on appellant to give Williams's agent, if the boy was his agent, any explanation of the difference between regular messages and day letters.

It was a question for the jury, taking into consideration the boy's age, and the other circumstances, assum-

ing that Williams sent the message by the boy to the depot, to determine whether or not the boy was acting in the capacity of agent of Williams for the purpose of sending the message and directing the particular form it should take, or whether or not he was a mere messenger, without any discretion in the matter, and simply serving as a vehicle for the transmission of the message from Williams to the appellant's operator at the depot.

The vice of the instruction is that it assumes as a fact that the boy was not Williams's agent, vested with the authority to speak for Williams, and having knowledge of the difference between day letters and straight messages and discretion to select between the two. It assumes as a matter of law that it was necessary for appellant to explain the difference between a regular message and a day letter to the boy regardless of the evidence tending to show that the boy was about fourteen years of age, and that he appeared to know the difference. The instruction assumes that the boy was not Williams's agent to send the message, and also assumes that in giving directions that the message should be sent as a day letter, the boy was acting without authority from, and without the knowledge of, Williams.

Other objections are urged, but we find no reversible error in the rulings of the court except as above indicated. For the error in granting appellee's prayer for instruction No. 4, the judgment must be reversed and the cause remanded for a new trial.